hearing hearing hearing. The United States Court of Appeals for the 11th Circuit is now open and calling to law. God save the United States in this honorable court. Good morning, and welcome to our virtual sitting. Judge Rosenbaum, Judge Newsome and I are sad to not be with you in Jacksonville, but given the uncertainty with the track of Hurricane Ian, we just did not want to take any chances for anybody and thought it was best to have this sitting virtually. So given that there's bad weather in some parts of the circuit, we may encounter some technological problems. If the internet goes out, just hang in there with us. We'll try to reboot everything, and if necessary, we will do it by phone, but we'll get through it one way or another. And with that, we're ready to start with our cases. Our first case today is number 21-11341 United States versus Robert Dumas. Mr. Escobar. Good morning, and may it please the court. My name is Richard Escobar, and I represent the appellant Robert Dumas. This case, your honors, and this court's decision will have a significant impact on the procedures employed by law enforcement agencies throughout the country to protect the integrity of investigations, procedures to mandate the use of body-worn cameras. The total disregard by law enforcement to abide by these procedures exposes the lack of credibility and damages the integrity of their investigation. Mr. Escobar, can I ask you a quick question? This is Judge Newton. So the district court, I mean, obviously, you know, credibility findings are for the district court and the district court factored into its analysis the shoddy, I'll admit, use of body cam footage here and said that that was sort of a checkmark against the credibility, but on balance that she still found the officer credible. It seems to me that that ought to enhance, not undermine the district court's credibility. Why not? Well, it does not. And I'll tell you why. The court actually cited to a southern district case by the name of Sims. And what the court used in order to determine the credibility of Officer Denbo is they said, well, Officer Denbo was calm, Officer Denbo was professional, and Officer Denbo was courteous. In the Sims case, there was a more important factor that this court actually disregarded, and that was one of honesty. If you look at the Sims decision, the Sims decision actually also used the credibility of fellow officers that testified in that case to corroborate testimony and also use the dash cam to corroborate that testimony. And so I think that the district court's reliance on just some officer that comes before it and is courteous, professional and calm does not equate to honesty and integrity and credibility. Well, go ahead, please. Go ahead. That's OK. All right. Thanks, Mr. Escobar. Related to that, though, the problem, I understand exactly what you're saying. And if we were sitting in the first instance, maybe one or more of us would come to a different conclusion. But we did not see Officer Denbo testify. And it doesn't seem like there's anything that's improbable or contrary to the laws of nature in the findings that the district court made. So how do we I mean, given that that is our standard of review, how do we what would you point to to suggest that there's something in the district court's finding that satisfies the standard of clearly erroneous? Well, I think one of the errors, obviously, that the district court did make is that they didn't analyze the facts and circumstances that were presented by Officer Denbo. They just took the fact that he appeared calm, professional and courteous on the stand and equated that to some credibility determination. But when you look at the facts and circumstances of this particular investigation, it is fraught with with problems, frauds with conflicting testimony. And I'll take you through it, at least for the marijuana arrest. When Officer Denbo first started this particular investigation, he started by going for the second time now to the driver's door and said that he smelled marijuana, 0.02 grams of marijuana. I think it's incredible for any individual to opine that they smelled marijuana. Let me stop you there for just a second. Yes. I noticed, too, when I went through the videos, you know, you don't see him actually finding the cigarette that he talks about. You do see debris on the floor. But then I noticed that while the officer is speaking to Mr. Dumas and Mr. Officer has actually tested the marijuana, he says something like, why would you drive so fast when your car smells like marijuana? Which seems to me to corroborate or at least provide some corroboration for the idea that the officer smelled the marijuana before he tested and found it to actually be there. What do you think about that? Well, I what I think about that is that it is incredible to suggest that the officer in his testimony says, well, listen, there was debris of marijuana on the seat, the driver's seat and on the driver's floorboard. But he retrieves none of that debris. He actually goes to the passenger side and says, well, there's debris, flakes of marijuana on the passenger seat. He doesn't retrieve any of that either. But instead, he goes under the passenger seat and retrieves some item that he then places on the on the seat. He never tested that item either. When he comes back for the presumptive test, he goes back under the seat in a very suspicious manner of doing a presumptive test with a body worn camera on and retrieve something that no one can see, that no one can see whether he placed in the tube. Even when you look at the tube and it's changing colors, you can't even see a particle in that tube, not to mention that he didn't use gloves throughout this entire search, which even Officer Dembo admits it's a big concern because it contaminates whatever he touches. So I find his testimony to be incredible, actually incredible. But I think that he had the need in order to find some reason to arrest Mr. Dumas. If you recall, he did the presumptive test only after he spoke to Agent Toner and his supervisor. And those agents told him there is no probable cause to arrest Mr. Dumas based upon the robberies. I think that's interesting that he would do that presumptive test only after that conversation because he had to find a way to arrest Mr. Dumas for something in order to seize items that he had no business seizing. And those were the personal items. I think that we can agree that what intrigued early on Mr. Dembo in this particular case was a black Nike shoe, which is common throughout the country. Even Officer Dembo admitted hundreds of people have a similar shoe. But somehow he thought because that shoe was in the vehicle, somehow Mr. Dumas was tied to the robbery. I think that it's curious. I can't I cannot hear you. I still can't hear you. Apologies. Wasn't it more than that? I mean, didn't didn't the officer also find a face mask with rectangular eye holes cut out and the gray bank bag and a number of other items that had been reported along with along with the bolos for the bank robberies? And wasn't he driving a car that matched the description? And didn't he also have a gun that seemed to match the description of one of the firearms that was allegedly used in the robberies? No. And respectfully, I'm glad you brought up the bank bag because there are some assertions in the appellee's brief that are totally incorrect. If you look at the subway video of the robbery of the subway video, you will see the bank bag being handed to Mr. Dumas. That is a very, very light gray bank bag and is much larger than the bank bag that was actually located in Mr. Dumas's vehicle. Mr. Dumas's bank bag was black. And so that's depicted, if the court wants to note this in subway video at eight colon zero one zero five p.m. to eight colon zero one colon fourteen p.m. It is also depicted in the axon video, which is Defendants Defendants Exhibit number eleven. And it's also depicted in government's exhibit number five, which is a series of photos that includes the black bank bag. So, no, you know, the the mask was a mask that initially appeared to be what it was, which was a Halloween mask. Officer Denbo, when he picked up that mask, he turned it inside out to make it appear as the mask that was word worn by the robber. And no, the gun, I think, was was, you know, completely different than many of the observations by some of the victims of these robberies, where they indicated that it was a stainless steel slide, that it was somehow a shiny slide on that particular firearm. If the court. I'm sorry, I agree, there was that kind of indication, but I thought there was also maybe I've got this wrong, so it's important for you to let me know. I thought there was also reported a black gun that had been used in some of the robberies. Is that not correct? That is correct. But no further description. No, you know, no make manufacturer, you know, nothing really descriptive. In fact, when you look at all the bolos, that's the real problem with these bolos. Is that there's really no real descriptive information that can identify either an individual or an object. And so they use those particular bolos to somehow, you know, indicate that my client was the individual that they had probable cause to arrest or to seize the personal items. Curiously enough, if you look at the bolos, you will never see in the bolos that there was any indication that the robber had blue eyes. That information strictly came from Officer Denbo in his testimony before me in the motion to suppress and in his police report. But nowhere in these bolos does it mention that the robber had blue eyes, which is somewhat curious. And again, it goes to the credibility of Officer Denbo in this particular case. If any victim would have said the robber had blue eyes, would we not expect that to be in the bolos such critical information? And it wasn't. Again, I think that the court here made their error in just assessing Officer Denbo as to how he testified, rather than analyzing the factual information that was taking place to judge the credibility of the evidence in Officer Denbo. Curiously enough, Mr. Escobar, can I ask you a question? Sure. Let me switch gears a little bit and turn to the Miranda claim. Didn't the body cam footage capture Officer Denbo reading Mr. Dumas, his Miranda rights, and then Mr. Dumas began to answer some questions? A hundred words of Miranda in 13 seconds. That's about almost eight words a second. Do we think that that lends any credibility whatsoever to Officer Denbo in explaining someone the most important constitutional rights that you can have in a criminal investigation? And likewise, of course, never asked him if he wanted to waive it. And then when he goes to the station to provide him his second Miranda warnings, he does so in a room that is not recorded. And again, he does not ask him to sign the area where it says I'm waiving those particular rights. The only thing that my client does after he's read that very rapidly, lightning fast Miranda, is he says, what am I being arrested for? Not I am waiving and I'm talking to you freely and voluntarily, but what am I being arrested for? I think Judge Newsom might have had a question for you when I interrupted. No, no, no. It's OK. It's OK. All right, Mr. Escobar, thank you very much. You've saved your time for rebuttal. Thank you. All right, Mr. Sikkanen. Good morning, Your Honors. May it please the court, Sean Siakkanen for the United States. I'll start with the probable cause issue. Body cameras often help to create a better record and improve the administration of justice. But they're not perfect and they should not impose. Yes, I'm sorry to interrupt, but I mean, this is really disturbing. The body camera seems to be turned off about 13 different times. And it just makes you wonder what's going on. I know that the officer gave an explanation and said that he was worried that the battery was going to run out. But we don't see him finding the used marijuana cigarette. And I mean, it does seem a little odd that it's turned off 13 different times. What's going on here? I don't think there's anything suspicious or mysterious about any of it. I think it is exactly what Corporal Denbo said at the suppression hearing. He admitted at the outset that he had forgotten to charge the battery the night before. And then the next morning before he began that shift, he took what I think to be reasonable and prudent steps to fix the problem as best he could. Number one, he contacted his commander to let him know what he had done. He began his shift without the camera, stayed nearby his house while it was charging, went home to pick it up when he thought that it was charged enough to be to be some use. And it was at that point less than 40 percent, I think closer to 30 percent charged on a maximum 12 hour pack. So he had at most about no more than like four hours of recording time, which he knew. And he bumped into Mr. Dumas, which must sped past him just minutes after picking this camera up from what the record tells. And he has consistently admitted and we do not dispute that he should have been wearing the camera and operating the camera from the moment that he got out of the car to approach Mr. Dumas. And it's unfortunate that he wasn't, but he's accepted responsibility for that. The district court accepted that explanation as plausible and understandable, which I think it is. And the standard of review on appeal on credibility determinations is is that this court will defer to the district court's credibility finding unless there's clear and indisputable evidence that the witness's testimony was contrary to the laws of nature or so improbable that no reasonable fact finder could accept it. And I don't think there's anything like that in this record. There were also problems weren't there with. Officer Dembo's record keeping, I mean, some of the information contained in the reports don't match up to his testimony during the suppression hearing, right? I'm sorry, you'll have to be more specific, your honor. Where he found some of the contraband, for example. Well, again, this was something that he explained at the suppression hearing. And the only the only remote inconsistency that Mr. Dumas has identified is this statement in the report that the charged cigarette and another piece of marijuana were found wedged between the console and the seat. And Mr. Dumas or excuse me, Corporal Dembo explained at the at the suppression hearing that he simply meant to include a comma indicating that he found the charged cigarette comma and then other marijuana in a different place. And also, it's not the case that the camera doesn't show. I'll say this. The camera does capture the area, the makeshift ashtray behind the gear shift where Corporal Dembo explained that he found the cigarette. You can see that space at various points in the video. Now, you can't clearly see a cigarette, the charged cigar there. But again, the standard on review is whether there is evidence that clearly contradicts what the officer has said. That the standard can't be that a police officer's testimony is is incredible unless there's clear and indisputable body cam footage to specifically and irrefutably corroborate every aspect of it. And that really seems to be what what Mr. Dumas is asking for in this case. I think that would be an impossible standard. It would be an unmanageable standard. And no court has ever held that. And can I ask you a question, Mr. Siakonen, about the seizure of the robbery related items? I mean, so in my mind, you know, once he's seen the marijuana debris, so under the automobile exception, he's got probable cause to search the car where contraband might be located. Fine. But then I think, as I understand the doctrine, to seize the robbery related items, he's also got to have probable cause to think that they are, you know, sort of related to a crime. And how do we factor into that conversation the fact that the special unit, the name of which I've now forgotten, special investigations unit told him at this point, you don't have probable cause to arrest Dumas for the for the robberies. And since since the robberies, since it's only robbery, robbery related items, we're talking about seizing and the special investigations unit says you don't have probable cause to arrest him for the robberies. How does he have probable cause to to seize those robbery related items? Two answers to that, Your Honor. The first is that he could have probable cause to believe that those items were related to the robbery and therefore to seize them, even if he didn't have probable cause to believe that that they linked Mr. Dumas to the robbery. He could seize them just for on any fair suspicion, reasonable ground to suspect that they were the items that had been used in the robbery. Even if you can imagine a hypothetical scenario where perhaps there was less evidence in this case and and and it wasn't clear that they belonged to Mr. Dumas. So it's not the case, as as my opposing counsel said earlier, that he needed to arrest Mr. Dumas to seize this evidence. That's that's clearly not true. That's my first answer. My second answer is that what the arresting officer or any other officer or what what what a state's attorney thought about probable cause is irrelevant. And this is established case law cited in our brief. When when courts assess probable cause, they look at it objectively based on the totality of the circumstances. And all that matters is what facts were known to the arresting or seizing officer, not the arresting or seizing officers or anyone else's subjective opinion about whether or not those facts in the constituted probable cause. And I'll make one more point on this. The record does indicate that the investigating detective and one of the attorneys apparently told Dumas that they didn't think that that was enough evidence, that they wanted more. I don't know what they meant by that. I certainly think and I think most most courts would would find this evidence more that more than probable cause to suspect that all of this evidence might have been involved in the robberies, whether or not it implicated Mr. Dumas. And I guess I'll leave it at that. So I want to respond to something that my opposing counsel said. I don't think that the standard for admissibility can't be that I'm sorry, the standard for credibility can't be that no testimony is credible unless it's clearly and incontrovertibly corroborated on video in every respect, that's that's not the law. And that would be an impossible standard. And no body camera is capable of capturing every detail seen by the person wearing it. The officer may turn his head in a different direction than the camera's facing, his eyes may look in yet another direction. And the naked human eye may notice details that are visible in person, but not in the recorded video. And all of that happened here. And that's really all that happened. Nothing more. There was nothing suspicious about what Corporal Dembo's camera captured or didn't capture. If you watch that video, it's clear to me that the supposed omissions and inconsistencies are just natural and expected limitations of a fixed position body camera when it's on, when it's on. It's not all the time. And it was so this is another point. He did turn the camera off, but there's no evidence that he turned it off. At any material point, he he recorded the entire search of the vehicle. He didn't turn it on and off as he was searching the vehicle. He recorded the entire Miranda warning and each of the videos includes him walking to and from the vehicle or to and from DeMoss to administer the warning. So there's there's I don't see anything suspicious about how and when the video stops and starts. Other than the fact that, yes, the policy ideally required him to keep it running continuously. But as he explained, he had less than four hours of battery time left. It was the beginning of a shift. He was on a 12 hour shift. And I mean, I think this this record illustrates the point. If he had left his his camera recording continuously when he wasn't engaging in material investigative activities, then his battery likely would have died far before the end of the eight hour period that it that it covered in this record, Mr. Escobar says that Officer Dembo read the Miranda warnings, which totaled about 100 words in 13 seconds. What's your response? I haven't timed it that that could be right. I haven't listened to the Miranda warnings dozens of times. I don't have much problem understanding what was said. The first you're not you're not a you're not a typical listener. That's true. So I want to make a few points on that. And the first one is that the verbal warning is actually irrelevant because he was warned twice. And there's absolutely no problem at all with the written warning or the written warning that he received here. And he did not make any statements incriminating himself in the robberies for which he was convicted until after the written warning, the only material statement that appears in the record between the first and the second Miranda warnings was Mr. Dumas's admission that he smoked marijuana because his baseball team didn't test for it. And this goes back to a point that came up earlier that Judge Rosenbaum made not only I would say Dumas acknowledged either explicitly or implicitly the marijuana in the vehicle at least twice. He also acknowledged it after Corporal Dembo had Miranda eyes to him. And one of the first things he asked him after reading his Miranda rights was, what's the deal with the weed in the car? And he said, I smoke weed because my baseball team doesn't test for it. He didn't say what weed in the car. He didn't dispute that there was any weed in the car. So it's really incredible to me, frankly, to now suggest that there was no weed in the car. Another point, let's go back to the Miranda warning and we'll take them sequentially. Sure. Tell me if Mr. Escobar is right about the speed at which the Miranda warning was delivered. How could any person comprehend what is being given to him? Well, the factors that this court typically looks to in assessing whether or not Waver Miranda was knowing involuntary, and this is the Hubbard case on page 33 of our brief, defendant's intelligence, in this case, normal length of his detention, less than eight hours in this case between the reading, the first reading and in his initial confession. I'm only talking I'm only talking about the first verbal warning. I'm not talking about the written one yet. Right. Well, I think that all of these factors, but all of those assume that the person was read warnings at a speed at which a reasonable person could comprehend what was being said. Right. I think that these warnings were read at a speed at which a reasonable person could comprehend, and there's nothing in the record to indicate that he didn't. And, you know, again, I mean, I'll say that I think that this is a particularly this is not a good vehicle for the court to really wade into, you know, how fast a Miranda warning can be read verbally, which I'm not aware. I did not find any case law addressing that. And I think that this would be a poor vehicle because the first Miranda warning doesn't matter in this case because of the second Miranda, the second Miranda warning clearly was OK. And none of the relevant statements bearing on the robberies occurred before the second Miranda warning. But I take your point that the question being, you know, how the courts assess a Miranda warning, that the speed with which the speed of the clarity with which a Miranda warning is read. And I guess what I could say on that is that while the ultimate determination on knowing involuntariness is typically viewed as a mixed question of fact and law reviewed to no one appeal, it would seem to me that something that specific as as to how fast it was read and the defendant's ability to comprehend the words, that seems much closer to a fact bound determination to me that that would be up to the district courts to make in the first instance. And I on this record, I certainly does not seem clearly erroneous to me for the district court to have found that Mr. Dumas could have understood the first verbal warning. So if the court has no other questions, I'll just just a few general points in closing. No police officer is perfect. The test for admissibility is not perfection. And as I've discussed, it's unfortunate that Corporal Dunbow had not charged his battery and wasn't utilizing his camera continuously as he should have. But he consistently admitted this, did what he could to rectify it. And other than that mistake, he was diligent, attentive and thorough at every step of this investigation, particularly in recognizing physical evidence that he reasonably and correctly thought might be related to that spree of robberies in Mirandizing Dumas twice and in notifying the investigating detective. And I think that's the kind of police work that we want. I think it's faithful to the Bill of Rights. And I think I think that those parts should be commended. All right, thank you very much, Mr. Escobar, you've got three minutes left for rebuttal. It plays the court. I'm going to start with the 13 times that Officer Dunbow stopped his camera and my cross examination of him in the motion to suppress. He tried and tried again over and over again to make the excuses that somehow these stops were sanctioned by the general order, the prosecutor stands up in the middle of the suppression hearing and tells the court there was absolutely no excuse for Officer Dunbow to turn off his body cam. There is nothing in the order that allows him to turn that off. In 39 years of my practice, I have never had a prosecutor stand up and do that. Clearly, the prosecutor himself did not believe what Dunbow was trying to assert to the court as excuses, not to mention the fact the difficulty, Mr. Escobar, I think is sort of where we started. This argument is that presumably you made that exact argument, the district court, who sat there and watched this whole thing go down and determined that despite that, this witness was credible. And I just don't know how it is that we three sitting here years after the fact can counterman that decision. I don't think that any reasonable fact finder could make that conclusion. I say that with all due respect to the district court. And let me tell you why. When the camera when Officer Dunbow believed that the camera was off, what did we find on two occasions? We find him speaking to other officers talking about the deceptive plan that they had to arrest my client and instead of taking him to the county jail where he could make bond, we're going to take him to the station so that we can then further investigate a robbery for which there was no probable cause to seize any of these items. It's curious that the property receipt itself identifies all these personal items as related to the marijuana case, not related to any robbery. So the cumulative effect of Officer Dunbow's testimony, I think, stands for the position that no reasonable fact finder could have found him credible. Composed with that is the fact that the court failed to really analyze any of the facts dealing with the issue of probable cause, both for the arrest and for the seizure of items, I'll leave you with this. What knowledge did my client have of a small particle of debris underneath the passenger seat in order to subject him to probable cause to arrest for marijuana? How in the world that would mean that every one of us that get into a car and and have debris on our shoes and we leave that debris somewhere on the floorboard are subject to arrest merely because this minuscule particle now somehow test presumptively as marijuana, noting that the presumptive test was not within the eye view of the body worn camera. I think this case is clear. I know the decision is difficult, but I think this facts and circumstances merit the court's court's reversal in this matter. All right, thank you both very much. We appreciate the help.